IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| DAVID GLASSCOCK,<br><br>                 Petitioner,<br><br>v.<br><br>STATE OF UTAH,<br><br>                 Respondent. | **MEMORANDUM DECISION<br>& ORDER DENYING<br>HABEAS-CORPUS PETITION**<br><br>Case No. 4:18-CV-4-DN<br><br>District Judge David Nuffer |

In this federal habeas-corpus case, *pro se* inmate David Glasscock,[1] attacks his state conviction. 28 U.S.C.S. § 2254 (2021) ("[A] district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."). Having carefully considered the Petition and exhibits, (ECF No. 3); Petitioner's declaration in support of the Petition, (ECF No. 4); the State's answer and exhibits, (ECF No. 7); and, Petitioner's reply memorandum opposing the answer, (ECF No. 16), the Court concludes that Petitioner has procedurally defaulted most issues and not surmounted the federal habeas standard of review on remaining issues. The petition is therefore denied.

---

[1]Because Petitioner is *pro se*, his pleadings must be construed liberally. *Garrett v. Selby, Connor, Maddux, & Janer*, 425 F.3d 836, 840 (10th Cir. 2005). However, this requirement does not obligate the Court to form arguments for him or excuse compliance with procedural rules. *Id.*

BACKGROUND ................................................................................................... 2
PETITIONER'S ASSERTED GROUNDS FOR FEDERAL-HABEAS RELIEF ....................... 5
PROCEDURAL DEFAULT .................................................................................... 6
   A. Cause and Prejudice ................................................................................ 7
   B. Actual Innocence ..................................................................................... 8
   C. Summary .................................................................................................. 9
MERITS ANALYSIS ............................................................................................ 9
   A. Standard of Review .................................................................................. 9
      1. Factual Findings ................................................................................ 10
      2. Legal Determinations ........................................................................ 11
   B. Post-Arrest Incriminatory Statements ..................................................... 13
      1. Factual Findings ................................................................................ 13
      2. Legal Conclusions ............................................................................ 18
   C. Identification Evidence ........................................................................... 22
      1. Factual Findings ................................................................................ 22
      2. Legal Conclusions ............................................................................ 24
   D. Appellate-Counsel Ineffectiveness ......................................................... 25
      1. Counsel did not move for Utah Rule of Appellate Procedure 23B remand to establish ineffective assistance of trial counsel. (ECF No. 3, at 43.) ................................................. 26
      2. Counsel did not request overlength brief and did not refile motions for new trial and to disqualify trial counsel. (*Id.* at 44.) ................................................................ 27
      3. Counsel did not raise cases *Henderson*, *Lawson*, *Clopten*, and *Brownlee* in the opening brief. (*Id*. at 44.) (4) Counsel did not raise the issue of Officer Fitzgerald being on the witness list but not testifying. (*Id*. at 45.) .................................................. 28
      4. All claims of ineffective assistance of appellate counsel lack case law on point. ............ 29
CONCLUSION ..................................................................................................... 30

# BACKGROUND

In May 2011, a young man (Victim) was standing outside of a community center in Salt Lake County when three men in a gray Dodge Stratus pulled over and parked nearby. One of the men got out of the back seat of the car, ran toward Victim, and put a gun to Victim's head. The man asked Victim if he had any drugs. When Victim did not respond, one of the men in the Stratus told the

assailant to hurry up. The assailant took Victim's backpack and got back in the Stratus, which then sped away.

A woman who saw the Stratus drive off called 911. When police arrived, Victim described his assailant as "a white male in his early 40s" who was "wearing an eye patch." Police located a gray Stratus and followed it to a gas station on North Temple and Redwood Road, not far from where the robbery took place. There were three men in the vehicle--Patrick Woods, a black male in his mid-twenties; Randall Cropper, a white male in his late twenties or

2

early thirties with long hair; and Glasscock, a white male in his fifties with long hair. Woods was driving, Cropper was in the passenger seat, and Glasscock was in the back seat. Police ordered the men out of the car and handcuffed them.

In the meantime, another officer drove Victim to the gas station and parked across the street. Using binoculars, Victim got a "clear view" of each man and identified Glasscock as his assailant. Police searched the vehicle, finding a loaded pistol under the driver's seat and a short rifle and an empty vodka bottle in the trunk. Police then took Glasscock into custody for further investigation.

During a half-hour interrogation, Glasscock initially claimed that he could not remember what happened because he had been in a "stupor"--he was "toasted" from "eating Lortabs" for his broken hand and foot, and he had been drinking vodka. When pressed, Glasscock admitted that Woods handed him a gun and pressured him to approach Victim. Glasscock denied pointing the gun at Victim and also claimed he could not remember taking a backpack. But when police told him that the backpack had Victim's homework in it, Glasscock admitted that Cropper had thrown the backpack out of the car before police arrived.

Glasscock was charged with aggravated robbery and possession of a firearm by a restricted person, based on a prior felony conviction. He waived his right to a jury trial and moved to suppress the statements he made to police and Victim's identification.

At trial, Victim testified and identified Glasscock as his assailant. The State played a video of Glasscock's confession, and the officers that arrested Glasscock and searched the Stratus also testified. In his defense, Glasscock raised the possibility that Victim mistook Cropper for him, arguing that Cropper had access to Glasscock's eye patch and could have used it. Glasscock testified that he did not remember what happened the day of the robbery because, at the time, he had not been taking his medication for a mental illness, he was using heroin, and he had drunk "about three-quarters of a gallon" of vodka. He claimed not to remember "robbing anybody" or "threatening anybody with a firearm." And he explained that he had tried to tell the detectives what really happened during his interrogation, but they "basically forced [him] to say what they wanted [him] to say." According to Glasscock, he went along with the detectives only because he "was scared to death" after a "bad run-in with the Salt Lake Police Department back in 1987" and because he was "still intoxicated" but "was trying to maintain" so that he did not look intoxicated.

One of the detectives that interrogated Glasscock countered that Glasscock "seemed pretty good actually, all things considered." And he testified that "compare[d] . . . to other intoxicated

3

> individuals" the detective had questioned, Glasscock appeared to
> be "in pretty good condition.". . .
>     The district court denied Glasscock's motions to suppress the
> confession and Victim's identification and found Glasscock guilty
> of both charges.

*State v. Glasscock*, 2014 UT App 221, ¶¶ 2-9, *cert. denied*, 343 P.3d 708 (Utah 2015).

In the Utah Court of Appeals, Petitioner unsuccessfully argued (a) his confession should

have been suppressed due to his intoxication and coercive interrogation tactics by police; (b)

unconstitutional unreliability of eyewitness identification; and (c) ineffective assistance when

trial counsel did not challenge admission of a prior felony conviction. *Id*. ¶ 1. Petitioner's

certiorari petition (challenging just issues (a) and (b), but not (c), raised in the court of appeals)

in the Utah Supreme Court was denied. *State v. Glasscock*, 343 P.3d 708 (Utah 2015) (table).

Petitioner then brought a state petition for post-conviction relief (PCP), asserting

ineffective assistance of trial and appellate counsel,[2] trial-court error in managing some motions,

and the prosecution's violation of discovery rules, cumulative error and structural defects. (ECF

No. 7-16.) Under the Utah Post-Conviction Remedies Act, Utah Code Ann. § 78B-9-106(1)

(2021), the trial court ruled that all but one of these issues (appellate-counsel ineffectiveness)

were precluded from further consideration because they were or could have been raised at trial or

on appeal. (ECF No. 7-5, at 5-7.) Meanwhile, Petitioner's ineffective-assistance-of-appellate-

counsel claims were rejected on the merits. (*Id*. at 7-11.) The trial court's decision was

---

[2]Specific claims of ineffective assistance argued appellate counsel did not: (a) move for a Utah Rule of Appellate Procedure 23B remand to show ineffective assistance of trial counsel; (b) refile trial-counsel-disqualification and new-trial motions; (c) raise trial counsel's ineffectiveness in not calling Officer Fitzgerald to testify; and (d) challenge factual findings and legal conclusions in order denying suppression motion. (ECF No. 7-16, at 23-26.)

    Also under the heading "ineffective assistance of appellate counsel," Petitioner attacked the trial court for plain errors, nonfederal code and rule violations, and discretion abuses, but did not indicate how they qualified as ineffective-assistance claims. These issues include: ignoring motions; not requiring trial counsel to move to reduce sentence; letting trial counsel consult with a social worker, Petitioner be represented by ineffective counsel, and prosecutor misbehave; and not conducting conflict hearing as to sentencing counsel. (*Id*. at 27-28.)

summarily affirmed by the Utah Court of Appeals. (ECF No. 7-6.) Petitioner's certiorari petition

in the Utah Supreme Court was denied. *Glasscock v. State*, 412 P.3d 1258 (Utah 2018) (table).

## PETITIONER'S ASSERTED GROUNDS FOR FEDERAL-HABEAS RELIEF

Petitioner meanderingly raises several issues, summed up as follows:

> (1) State trial court breached Petitioner's federal rights, in factual findings and legal conclusions, when denying his motion to suppress his post-arrest incriminatory statements. (ECF No. 3, at 5, 13-18.)
> (2) Trial court breached Petitioner's federal rights, in factual findings and legal conclusions, when admitting evidence of victim's identification of him. (*Id*. at 7, 19-26.)
> (3) In a variety of ways, trial and appellate counsel provided unconstitutionally ineffective assistance in representing him. (*Id*. at 8, 27-47.)
> (4) Trial court breached Petitioner's federal rights in handling of his motions to disqualify counsel and for new trial. (*Id*. at 10, 48-51.)
> (5) Trial court breached Petitioner's federal rights in allowing prosecutorial misconduct of holding back evidence in discovery and not ensuring motions were heard. (*Id*. at 52.)
> (6) Cumulative and "structural" error. (*Id*.)[3]

Of note, the petition is fifty-five pages long--much of it a dense narrative of allegedly

unfair circumstances that nearly defies the ability to parse out and treat every possibly-raised

issue. The most efficient way to manage the deluge of "possibly-raised issues" is to refrain from

trying to articulate and list them one by one, but to instead explain that, if an issue in the petition

was not specifically brought before the state courts and addressed below on the merits, it is

---

[3]"'A claim of cumulative error cannot be recognized when there is no underlying error to support it.' Because none of [Petitioner's] individual claims . . . are successful, taken together they cannot constitute cumulative error." *Montez v. Wyoming*, 431 F. App'x 750, 755 (10th Cir. 2011) (unpublished). Cumulative error will thus be considered no further here.

Moreover,

> [a]s the Supreme Court has often observed, structural errors occur in only a "very limited class of cases." *Johnson v. United States*, 520 U.S. 461, 468 (1997). Errors deemed to be "structural" have included the total deprivation of the right to counsel at trial, a biased presiding judge, the systematic exclusion of members of the defendant's own race from a grand jury, the denial of the right to self-representation at trial, the denial of the right to a public trial, the denial of the right to have a district judge (rather than a magistrate judge) preside over jury selection, and a defective reasonable doubt instruction. *See United States v. Pearson*, 203 F.3d 1243, 1260-61 (10th Cir. 2000) (collecting cases).

*Malicoat v. Mullin*, 426 F.3d 1241, 1249-50 (10th Cir. 2005). Petitioner's vague references to structural error do not qualify and are not addressed again.

procedurally defaulted and barred from further consideration here. Like some of the more explicitly set forth numbered issues above, any "possibly-raised issue" is procedurally defaulted under the below analysis.[4]

## PROCEDURAL DEFAULT

The United States Supreme Court has declared that when a petitioner has "'failed to exhaust his state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred' the claims are considered exhausted and procedurally defaulted for purposes of federal habeas relief." *Thomas v. Gibson*, 218 F.3d 1213, 1221 (10th Cir. 2000) (quoting *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991)).

Utah's Post-Conviction Remedies Act states in relevant part:

> A person is not eligible for relief under this chapter upon any ground that:
> (a) may still be raised on direct appeal or by a post-trial motion;
> (b) was raised or addressed at trial or on appeal;
> (c) could have been but was not raised at trial or on appeal;
> (d) was raised or addressed in any previous request for post-conviction relief or could have been, but was not, raised in a previous request for post-conviction relief; or
> (e) is barred by the limitation period established in Section 78B-9-107.

Utah Code Ann. § 78B-9-106(1) (2021).

Again, instead of stating issues that are procedurally defaulted, it is more efficient to state issues *not* procedurally defaulted: Suppression of post-arrest statements, admission of identification evidence, and appellate-counsel ineffective assistance. All other issues were raised

---

[4]Also, any possible violations of the Utah Constitution or Code are not properly brought before this federal habeas court, so not considered here. *See* 28 U.S.C.S. § 2254 (2021) (stating federal habeas statute covers those in custody under state-court judgment only when "in violation of the Constitution or laws or treaties of the United States"). And, issues raised for the very first time in Petitioner's reply memorandum in opposition, (ECF No. 16), to the State's answer, (ECF No. 7), are not addressed, as waived.

or could have been raised, either at trial, on direct appeal or in a state PCP. Under Utah law, then, Petitioner may not raise those arguments in future PCPs, and the state courts would determine them to be procedurally barred. However, there are potential exceptions to procedural bar.

"This court may not consider issues raised in a habeas petition 'that have been defaulted in state court on an independent and adequate procedural ground[] unless the petitioner can demonstrate cause and prejudice or a fundamental miscarriage of justice.'" *Thomas*, 218 F.3d at 1221 (alteration omitted) (citation omitted). Petitioner asserts that cause and prejudice, and fundamental miscarriage of justice, excuse his procedural default. Specifically, he asserts that that he was hampered by lack of legal knowledge, resources, and representation in his post-conviction efforts, and, he argues the evidence shows he was not the assailant.

### A. Cause and Prejudice

"[T]o satisfy the 'cause' standard, Petitioner must show that 'some objective factor external to the defense' impeded his compliance with Utah's procedural rules." *Dulin v. Cook*, 957 F.2d 758, 760 (10th Cir. 1992) (citations omitted). Meanwhile, to demonstrate prejudice, "'[t]he habeas petitioner must show not merely that . . . errors . . . created a possibility of prejudice, but that they worked to his *actual* and substantial disadvantage.'" *Butler v. Kansas*, 57 F. App'x 781, 784 (10th Cir. 2002) (unpublished) (alteration in original) (quoting *Murray v. Carrier*, 477 U.S. 478, 494 (1986) (emphasis in original)).

Petitioner has not met his burden of showing that objective factors external to the defense hindered him in meeting state procedural demands. Under Tenth Circuit case law, lack of legal resources and knowledge (including Petitioner's own misunderstanding) are circumstances that do not carry Petitioner's burden to show cause. *Gilkey v. Kansas*, 58 F. App'x 819, 822 (10th Cir. 2003) (unpublished) (holding limited legal knowledge insufficient to show cause for procedural

default); *Rodriguez v. Maynard*, 948 F.2d 684, 688 (10th Cir. 1991) (holding petitioner's *pro se* status and corresponding lack of awareness and training on legal issues do not constitute proper cause for not previously raising claims). "Indeed, these are factors . . . that are *internal* to Petitioner's defense." *Ardon-Aguirre v. Sorensen*, No. 2:12-CV-914 DB, 2013 U.S. Dist. LEXIS 150269, at *11 (D. Utah October 18, 2013) (emphasis in original). Further, because "the Constitution provides no right to counsel in a collateral proceeding," lack of post-conviction counsel does not establish cause. *Sayed v. Trani*, 731 F. App'x 691, 697 (10th Cir. 2018). The procedural bar identified thus withstands Petitioner's assertions of cause and prejudice.

### B. Actual Innocence

Petitioner also suggests that miscarriage of justice will occur if his defaulted claims are not addressed. To be plausible, an actual-innocence claim must be grounded on solid evidence not adduced at trial. *Calderon v. Thompson*, 523 U.S. 538, 559 (1998). Because such evidence is so rare, "'in virtually every case, the allegation of actual innocence has been summarily rejected.'" *Id.* (quoting *Schlup v. Delo*, 513 U.S. 298, 324 (1995) (citation omitted)). Petitioner is burdened with making "a proper showing of factual innocence." *Byrns v. Utah*, No. 98-4085, 1998 U.S. App. LEXIS 31426, at *8 (10th Cir. Dec. 16, 1998) (unpublished) (citing *Herrera v. Collins*, 506 U.S. 390, 404 (1992)).

Petitioner's mere rehashing of the evidence and alleged violations of his civil rights in state proceedings do nothing to show that the exception applies. Indeed, the kernel of the analysis regarding actual innocence is not whether Petitioner urgently believes there were errors--or whether there were indeed errors--in state proceedings, but whether Petitioner is factually innocent. This factual innocence must also be supported with new evidence, which Petitioner has not provided.

### C. Summary

In sum, that most of Petitioner's issues are procedurally defaulted.  And, these issues do not qualify for consideration under the cause-and-prejudice or miscarriage-of-justice exceptions to the procedural bar. Habeas relief is thus denied as to all issues except those treated below on the merits.

### MERITS ANALYSIS

### A. Standard of Review

The standard of review to be applied in federal habeas cases is found in § 2254, under which this habeas petition is filed, stating in relevant part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim . . . resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or . . . resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.S. § 2254(d) (2021). "[A] determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." *Id*. § 2254(e)(1).

This "highly deferential standard," *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (quotation marks and citation omitted); *see Littlejohn v. Trammell*, 704 F.3d 817, 824 (10th Cir. 2013), is "'difficult to meet,' because [the statute's] purpose is to ensure that federal habeas relief functions as a 'guard against extreme malfunctions in the state criminal justice systems,' and not as a means of error correction." *Greene v. Fisher*, 565 U.S. 34, 38 (2011) (quoting *Harrington v. Richter*, 562 U.S. 86, 102-103 (2011) (citation omitted)); *see also Rippey v. Utah*, 783 F. App'x

823, 825 (10th Cir. 2019) ("If this deferential 'standard is difficult to meet, that is because it was meant to be.'" (quoting *Harrington*, 562 U.S. at 102)). This Court is not to determine whether the court of appeals's decisions were correct or whether this Court may have reached a different outcome. *See Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003). "The role of federal habeas proceedings, while important in assuring that constitutional rights are observed, is secondary and limited." *Barefoot v. Estelle*, 463 U.S. 880, 887 (1983). And, "[t]he petitioner carries the burden of proof." *Cullen*, 563 U.S. at 181.

### 1. Factual Findings

Habeas relief may be justified "if the state court's adjudication of a claim on the merits 'resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Hooks v. Workman*, 689 F.3d 1148, 1163 (10th Cir. 2012) (quoting 28 U.S.C. § 2254(d)(2) (2021)). State-court factual findings "are presumed correct unless the applicant rebuts that presumption by 'clear and convincing evidence.'" *Id*. (quoting 28 U.S.C. § 2254(e)(1) (2021)). Presumption of correctness applies to state trial-court and appellate-court findings. *See Al-Yousif v. Trani*, 779 F.3d 1173, 1181 (10th Cir. 2015). The presumption of correctness applies to implicit factual findings also. *See Ellis v. Raemisch*, 872 F.3d 1064, 1071 n.2 (10th Cir. 2017). The best way to explain the clear-and-convincing-evidence standard is that "it requires a high degree of probability." 2 Edward J. Imwinkelried et al., *Courtroom Crim. Evidence* § 2916 (2020). It is a "demanding but not insatiable" because "'[d]eference does not by definition preclude relief.'" *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003)). But, the Court "will not conclude a state court's factual findings are unreasonable merely because [it] would have reached a different conclusion in the first instance." *Smith v. Duckworth*, 824 F.3d 1233, 1241 (10th Cir. 2016) (internal quotation marks omitted).

Reviewing a state court's decision, a court must limit its "inquiry 'to the record that was before the state court that adjudicated the claim on the merits.'" *Cullen*, 563 U.S. at 181. This reflects that "[t]he federal habeas scheme leaves primary responsibility with the state courts." *Id*. at 182. And considering federal statutory "intent to channel prisoners' claims first to the state courts," it would not make sense "to allow a petitioner to overcome an adverse state-court decision with new evidence introduced in a federal habeas court and reviewed by that court in the first instance effectively de novo." *Id*.

### 2. Legal Determinations

Under *Carey v. Musladin*, 549 U.S. 70 (2006), the first step is determining whether clearly established federal law exists relevant to Petitioner's claims. *House v. Hatch*, 527 F.3d 1010, 1017-18 (10th Cir. 2008); *see also Littlejohn*, 704 F.3d at 825. Only after answering yes to that "threshold question" may a court go on to "ask whether the state court decision is either contrary to or an unreasonable application of such law." *House*, 527 F.3d at 1018.

> [C]learly established [federal] law consists of Supreme Court holdings in cases where the facts are at least closely-related or similar to the case *sub judice*. Although the legal rule at issue need not have had its genesis in the closely-related or similar factual context, the Supreme Court must have expressly extended the legal rule to that context.

*Id.* at 1016.

Further, "in ascertaining the contours of clearly established law, we must look to the '*holdings* as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.'" *Littlejohn*, 704 F.3d at 825 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 660-61 (2004) (emphasis added) (citations omitted)); *see also Fairchild v. Trammel*, 784 F.3d 702, 710 (10th Cir. 2015) (stating "Supreme Court holdings 'must be construed narrowly and consist only of something akin to on-point holdings'" (quoting *House*, 527 F.3d at

11

1015)). And, in deciding whether relevant clearly established federal law exists, a court is not restricted by the state court's analysis. *See Bell v. Cone*, 543 U.S. 447, 455 (2005) ("[F]ederal courts are not free to presume that a state court did not comply with constitutional dictates on the basis of nothing more than a lack of citation."); *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003) ("[A] state court need not even be aware of our precedents, 'so long as neither the reasoning nor the result of the state-court decision contradicts them.'") (citation omitted).

   If that threshold is overcome, a court may grant habeas relief only when the state court has "unreasonably applied the governing legal principle to the facts of the petitioner's case." *Walker v. Gibson*, 228 F.3d 1217, 1225 (10th Cir. 2000) (citing *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000)). This deferential standard does not let a federal habeas court issue a writ merely because it determines on its own that the state-court decision erroneously applied clearly established federal law. *See id.* "'Rather that application must also be unreasonable.'" *Id.* (quoting *Williams*, 529 U.S. at 411). Indeed, "'an *unreasonable* application of federal law is different from an *incorrect* application of federal law.'" *Harrington*, 562 U.S. at 100 (emphasis in original) (quoting *Williams*, 529 U.S. at 410).

   This highly demanding standard means to pose a sizable obstacle to habeas petitioners. *Id.* at 102. Section 2254(d) "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." *Id*. It maintains power to issue the writ when no possibility exists that "fairminded jurists could disagree that the state court's decision conflicts with th[e Supreme] Court's precedents. It goes no further." *Id.* To prevail in federal court, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing

law beyond any possibility for fairminded disagreement." *Id.* at 103. It is against this backdrop that the the standard of review is applied.

### B. Post-Arrest Incriminatory Statements

Was the Utah Court of Appeals's affirmance[5] on direct appeal of the trial court's factual findings and legal conclusion that the Federal Constitution was not violated, when denying Petitioner's motion to suppress his post-arrest incriminatory statements, "based on an unreasonable determination of the facts in light of the evidence presented" or "contrary to, or involv[ing] an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"? 28 U.S.C.S. § 2254(d) (2021).

### 1. Factual Findings

For convenience and consistency, the relevant facts, taken directly from the Utah Court of Appeals' decision on direct appeal, regarding Petitioner's confession are recounted:

> Glasscock argues that his confession was involuntary because the detectives employed "coercive police interrogation tactics" to take advantage of his unstable mental condition, and he argues that "[s]everal of the [court's] findings of fact" supporting the court's denial of his motion to suppress "were clearly erroneous." Specifically, Glasscock maintains that he was "significantly impaired from alcohol, heroin, pain pills" and that "he suffered from multiple disorders, including 'bipolar Type I,' 'post-traumatic stress,' and 'borderline personality.'" And even though the detectives "knew that Glasscock had consumed a number of impairing substances" that had "significantly impacted [Glasscock's] memory," Glasscock contends that they employed a "false friend technique" and other coercive strategies that "basically forced [him] to say what they wanted [him] to say." After carefully reviewing the evidence in the record, including the video of Glasscock's police interrogation, we agree with the district court that Glasscock's confession was not coerced.
> . . . .
> Here, the district court found that Glasscock "was lucid and properly oriented" during his interview with the detectives.

---

[5]The Court looks to the court of appeals's decision on direct appeal, as it is the last reasoned state-court opinion on the claim at issue. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991).

Although Glasscock's answers evinced some "hesitation at first," the court determined that he "voluntarily cooperated" throughout the interview. The court also determined that there "was insufficient evidence of intoxication, mental defect, or coercion to justify excluding the interview," so the "confession was fully knowing and voluntary." At Glasscock's urging, we have reviewed the video recording of Glasscock's interrogation and find . . . the district court's findings . . . unassailable.

. . . Glasscock's interview lasted roughly thirty minutes. The detectives engaged in several minutes of small talk, asking Glasscock where his accent was from, inquiring about why he relocated to Utah from Louisiana, and comparing the catfish in the two states. They also asked him for his birthdate and contact information, which he provided without hesitation. The detectives then advised Glasscock of his rights, and he affirmed that he was willing to continue the interview.

For the next fifteen minutes, Glasscock offered vague details of his role in the robbery and blamed his spotty memory on alcohol, pain medication, and other drugs. However, his recounting of how he came to be with his two companions, their travels over the hours before the robbery, and other aspects of their interactions was detailed and lucid. He admitted that he handled a gun that day, but claimed he did so only because Woods had handed him the weapon. When asked why he was in Salt Lake City, Glasscock told the detectives that Woods gave him a ride to run some errands before Glasscock could catch a bus back to Layton. But he claimed he had been in a "stupor" after taking pain medication and drinking heavily when "all of a sudden" he found himself lying in the backseat of a car "surrounded by cops." Without any prodding from the detectives, he also mentioned that he "ran into a Mexican dude today" that he initially thought "was one of the Romero brothers from the joint who had tried to stab" him. When he saw him, Glasscock said, he asked Woods to pull over, then "jumped out" and "was fixing to knock the dude on his ass." But he apologized and got back in the car when he realized he was mistaken. When the detectives asked Glasscock if the man had a backpack, he claimed he could not remember because he was "toasted" from "eating Lortabs" and drinking vodka.

At that point, one detective leaned forward on the table toward Glasscock and began questioning him more aggressively: "Listen. You robbed that guy of his backpack with a gun. Okay? That's what happened. There's no argument there. There's no discussion there. That's what happened. I want to know what was going through your mind at the time." Glasscock continued to assert that he could not remember because he was "so drunk," and he claimed that "one of the only things" he could remember was that Woods

14

and Cropper "were pressuring" him to find drug dealers to rob. One of the detectives then suggested that Glasscock had mistaken "an 18-year-old kid who is trying to get his GED" for a drug dealer and stole his backpack, and "now [the kid] has to make up all that work because he can't find his backpack."

   When Glasscock continued to plead ignorance, one of the detectives informed him that the other two men in the car "seem like angels to us" because "they're talking to us. You're the only one who is playing this other card." He continued, "Do you want . . . the courts to look at you as a cold blooded straight-up liar . . . or do you want to look like a guy who told the truth?" At that point, Glasscock admitted that Woods had handed him a gun and that he had approached Victim and asked Victim if he was "a dope dealer." He denied taking the backpack, but minutes later admitted that he had taken it and Cropper had thrown the backpack out the window while police were following them to the gas station. Near the end of the interview, one of the detectives asked Glasscock if he was sorry for robbing Victim, and he said yes.

   Throughout the interrogation, there is no indication, other than his own statements, that Glasscock was significantly impaired or suffering from a mental illness, and Glasscock offered neither expert testimony nor medical records at trial to support his own assertion that several mental illnesses--and having gone without medication--made him particularly susceptible to coercive questioning. To the contrary, on the video recording of the interview, he appears alert, he has no difficulty understanding the detectives' questions, and his answers are responsive and lucid. . . . Glasscock's demeanor throughout the interview simply did not provide the detectives with any reason to question his mental stability.

   . . . [T]he detectives' questioning in this case was straightforward, built on Glasscock's own statements and inconsistencies, and lasted only half an hour. The detectives did not misrepresent the strength of the evidence against Glasscock, make any threats, or falsely promise significantly more lenient treatment if he confessed. Glasscock has therefore failed to show that the district court was incorrect when it found that "[t]here was insufficient evidence of intoxication, mental defect, or coercion to justify excluding the interview."

*Glasscock*, at ¶¶ 14, 18-24.

   The paramount consideration here is that, by statute, this passage must be presumed

correct and its findings overturned only if unreasonable as viewed against clear and convincing

evidence identified by Petitioner. Petitioner, however, attacks the passage's findings, stating that, after listening to the taped questioning, the court "had no business making any kind of finding other than a finding in my favor based on my testimony and the detectives [sic] where he said that [Petitioner] was probably shitfaced and fucking loopy." (ECF No. 3, at 5, 13.) Petitioner further challenges the Utah Court of Appeals's affirmance of the trial court's factual findings, more specifically alleging: (1) The interrogation was "2 to 4 hours after arrest"; (2) he was emotionally unstable, injured and drunk during the interview; and (3) during questioning, he either denied his involvement or said only what officers told him to say. (*Id.* at 13-17.)

Petitioner does not offer any new evidence or new interpretation of the evidence. Neither does he challenge the relevancy and efficacy of evidence upon which the state courts relied for their factual findings. He simply repeats the angle on the evidence that he argued to the Utah Court of Appeals as to his impaired emotional, mental and physical state during the interview.

But both the state trial and appellate courts actually observed the interview recording. *Glasscock*, at ¶ 14. Their findings are lengthy and exhaustive. And a review of Plaintiff's main challenges, one by one, is unconvincing, especially when he bears the burden of showing clear and convincing evidence contrary to the courts' findings.

First, he states that the interrogation was two to four hours after arrest, but does not flesh out why that passage of time would place the findings in question. *See Anderson v. Attorney Gen. of Kan.*, 425 F.3d 853, 858-59 (10th Cir. 2005) (explaining habeas petitioner's factual allegations must be "specific and particularized, not general or conclusory" to show unreasonableness of state court's findings).

Second, without expert testimony or medical records, *id.* at ¶ 23, he suggests his mental, emotional, and physical impairment during the interview necessarily rendered the interview

coercive. But the courts were explicitly aware of this argument and considered it as they carefully catalogued Petitioner's ability to respond to questions in a sensical and engaged manner that showed his understanding of the words being spoken to him. He was able to cogently relate his day's timeline. Petitioner urges this court to take his word about his impairment (with no corroboration) and one detective's word (about his possible loopiness), above what they were able to personally witness and weigh as they observed on the recording his actual voice, responses, tone, and demeanor. *Cf. Cockrell*, 537 U.S. at 340 ("Deference is necessary because a reviewing court, which analyzes only the transcripts . . ., is not as well positioned as the trial court is to make credibility determinations."). As importantly, the courts were able to personally witness and weigh the detectives' voices, phrasings, tone, and demeanor. The courts specifically noted that the detectives did not try to trick Petitioner with hints about stronger evidence than existed, threats, or false promises of lenient treatment. *Id*. at ¶ 24.

Third, Petitioner argues the interview shows him either denying involvement or parroting back what officers told him to say. Again, the state courts heard the whole interrogation for themselves and had a different take on its tenor. Petitioner's argument is not clear and convincing evidence but just a divergent interpretation of what happened in the interview.

Petitioner's conclusory assertions that Utah courts should have given his testimony greater weight than the judges' own observations of his interrogation is not clear and convincing evidence and does not rebut the presumption of correctness under § 2254(e)(1). He thus "fails to persuade the Court that the state court's decision was based on an unreasonable determination of the facts." *Torres v. Williams*, No. 18-CV-2161-DDD, 2019 U.S. Dist. LEXIS 141986, at *18 (D. Colo. Aug. 21, 2019); *cf. United States v. Burson*, 531 F.3d 1254, 1258 (10th Cir. 2008) (stating "voluntariness determination based" on totality of circumstances not

undermined "merely because [subject] was intoxicated and distraught"). In sum, Petitioner has

not shown a high degree of probability that the Utah courts' factual findings were unreasonable.

## 2. Legal Conclusions

Based on the state-court factual findings upheld above, the Utah Court of Appeals

affirmed the state trial court's denial of Petitioner's motion to suppress his incriminating

statements in the interrogation. *Glasscock*, at ¶ 24. Petitioner asserts that affirmance "is

inconsistent with federal law on this issue," violating his federal constitutional right against self-

incrimination. (ECF No. 3, at 5, 13.) He contends his statements to detectives were involuntary,

the product of coercion. (*Id*. at 14.)

Remembering that review is tightly restricted by the federal habeas standard of review, it

is true, as set forth below, that the Utah Court of Appeals selected in general the correct

governing federal legal principles with which to analyze this alleged due-process issue:

> After carefully reviewing the evidence in the record, including
> the video of Glasscock's police interrogation, we agree with the
> district court that Glasscock's confession was not coerced.
> "The due process clauses of the Fifth and Fourteenth
> Amendments of the U.S. Constitution protect individuals from
> being compelled to incriminate themselves." *State v. Arriaga-
> Luna*, 2013 UT 56, ¶ 9. A confession is not compelled, however,
> "'[s]imply because [a defendant] was under the influence of drugs
> [or alcohol]'" at the time police questioned him. *State v. Maestas*,
> 2012 UT App 53, ¶ 39 (alterations in original) (quoting *United
> States v. Howard*, 532 F.3d 755, 763 (8th Cir. 2008)). And even if
> police are aware "of a suspect's mental illness or deficiencies at the
> time" he confesses, that fact alone is insufficient to demonstrate
> that the confession is the product of compulsion; the defendant
> must still demonstrate that police "effectively exploit[ed] those
> weaknesses" to obtain it. *State v. Rettenberger*, 1999 UT 80, ¶ 18
> (citing *Colorado v. Connelly*, 479 U.S. 157, 164-65 (1986)). "In
> other words, the evidence must show that" police employed
> "coercive tactics . . . [and] overcame the defendant's free
> will." *State v. Galli*, 967 P.2d 930, 936 (Utah 1998).
> To determine whether a confession was voluntary, we look to
> "[t]he totality of the circumstances," including "both the
> characteristics of the accused and the details of the

interrogation." *Arriaga-Luna*, 2013 UT 56, ¶ 10 (citation and internal quotation marks omitted). Characteristics of the accused that may indicate a particular susceptibility to coercive police tactics include "the defendant's mental health, mental deficiency, emotional instability, education, age, and familiarity with the judicial system." *Id*. (citation and internal quotation marks omitted). And details of the interrogation that may be relevant are "the duration of the interrogation, the persistence of the officers, police trickery, absence of family and counsel, and threats and promises made to the defendant by the officers." *Id*. (citation and internal quotation marks omitted).

For example, in *State v. Rettenberger*, 1999 UT 80, the Utah Supreme Court concluded that a defendant's confession was coerced where police made thirty-six false statements "about testimonial and physical evidence of [the defendant's] guilt" even though "they had no physical evidence linking [the defendant] to the crime." *Id*. ¶¶ 21, 45. The court noted that police used a "'false friend technique'" to convince the defendant "that they were his friends and that they were acting in his best interest." *Id*. ¶ 24. Additionally, police made "significant references to [the] defendant being charged with capital murder," and they "strongly suggested that [the defendant] would not face the death penalty as long as he confessed to the crime." *Id*. ¶ 29 (internal quotation marks omitted). The court observed that the defendant was interrogated over a two-day period and kept in solitary confinement for twenty-two hours, *id*. ¶ 33, and that when he finally confessed, he offered "little information that was not first provided or suggested by the interrogating officers," *id*. ¶ 40. And the court also noted that the defendant was vulnerable: he had "below-average cognitive abilities" and other mental conditions that made him particularly susceptible to the coercive tactics police employed. *Id*. ¶ 26.

Here, the district court found that Glasscock "was lucid and properly oriented" during his interview with the detectives. Although Glasscock's answers evinced some "hesitation at first," the court determined that he "voluntarily cooperated" throughout the interview. The court also determined that there "was insufficient evidence of intoxication, mental defect, or coercion to justify excluding the interview," so the "confession was fully knowing and voluntary." At Glasscock's urging, we have reviewed the video recording of Glasscock's interrogation and find that the district court's findings and conclusions are unassailable.

*Glasscock*, at ¶¶ 14-18.

The court of appeals then spent several paragraphs setting forth the facts already deemed in the past section to be not unreasonably determined. *Id*. at ¶¶ 19-23. The court of appeals wrapped up its application of law to facts as follows:

> Further, even if Glasscock were mentally impaired during the interview, Glasscock has not identified any evidence that calls into question the district court's finding that there was insufficient evidence of coercive tactics that would have overcome his free will. Unlike the officers in *Rettenberger* who employed a variety of threats, made false promises, placed the defendant in solitary confinement for twenty-two hours, and refused his request to speak with his parents, 1999 UT 80, ¶¶ 21-36, the detectives' questioning in this case was straightforward, built on Glasscock's own statements and inconsistencies, and lasted only half an hour. The detectives did not misrepresent the strength of the evidence against Glasscock, make any threats, or falsely promise significantly more lenient treatment if he confessed. Glasscock has therefore failed to show that the district court was incorrect when it found that "[t]here was insufficient evidence of intoxication, mental defect, or coercion to justify excluding the interview." As a consequence, we
>
> also agree with the court's ultimate legal conclusion that Glasscock's confession "was fully knowing and voluntary."

*Glasscock*, at ¶ 24.

Each of the court of appeals's citations supporting its appropriate exposition of the law regarding coercion of confessions has its roots in United States Supreme Court precedent. *See Arriaga-Luna*, 2013 UT 56, ¶¶ 9-10 (citing directly or through other citations *Withrow v. Williams*, 507 U.S. 680, 689 (1993); *United States v. Washington*, 431 U.S. 181, 188 (1977); *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973); *Davis v. North Carolina*, 384 U.S. 737, 746-47 (1966); *Malloy v. Hogan*, 378 U.S. 1, 6 (1964); *Haynes v. Washington*, 373 U.S. 503, 513 (1963); *Rogers v. Redmond*, 365 U.S. 534, 535 (1961); *Spano v. New York*, 360 U.S. 315, 323 (1959); *Leyra v. Denno*, 347 U.S. 556, 559-61 (1954); *Harris v. South Carolina*, 338 U.S. 68, 71 (1949)); *Rettenberger*, 1999 UT 80, ¶¶ 29, 33, 45 (citing directly or through other citations

*Beckwith v. United States*, 425 U.S. 341, 348 (1976); *Brown v. Illinois*, 422 U.S. 590, 601-01 (1975); *Lego v. Twomey*, 404 U.S. 477, 489 (1972); *Lynumn v. Illinois*, 372 U.S. 528, 534 (1963); *Wong Sun v. United States*, 371 U.S. 471, 486 (1963); *Blackburn v. Alabama*, 361 U.S. 199, 208 (1960); *Bram v. United States*, 168 U.S. 532, 542-43 (1897)); *Maestas*, 2012 UT App 53, ¶ 39 (citing through other citations *Townsend v. Sain*, 372 U.S. 293, 307 (1963)). The Utah Court of Appeals surely did not shirk its duty to adhere to the rich Supreme Court caselaw guiding its reasoning on this issue.

Respondent's answer rightly argued that Petitioner had failed his burden of finding on-point United States Supreme Court precedent and showing Utah Court of Appeals unreasonably applied it. (ECF No. 7, at 36.) However, Petitioner's opposition memorandum, (ECF No. 16), sought to cure that omission by citing several United States Supreme Court cases: *Arizona v. Fulminate*, 499 U.S. 279, 288 (1991) (holding coercion existed when confession motivated by "credible threat of physical violence"); *Keeney v. Tamayo-Reyes*, 504 U.S. 1, 5 (1992) (deciding whether deliberate-bypass standard is correct standard for excusing habeas petitioner's failure to develop material fact in state-court proceedings); *Mincey v. Arizona*, 437 U.S. 385, 401-02 (1978) (holding, when defendant asked not to speak without counsel and was "weakened by pain and shock, isolated from family, friends, and legal counsel, and barely conscious," defendant's "will was simply overborne" by detective's questions); *Townsend*, 372 U.S. at 322 (holding district court must hold hearing to resolve factual disputes about voluntariness of defendant's confession); *Blackburn*, 361 U.S. at 207, 211 (invalidating use of confession that "most probably was not the product of any meaningful act of volition" based on extensive and indisputable medical evidence of defendant's diagnosed insanity); *Lyons v. Oklahoma*, 322 U.S. 596, 597 n.1 (1949) (concluding circumstances rendering earlier confession involuntary did not render later

confession involuntary); *Bram*, 168 U.S. at 561, 565 (concluding confession involuntary when during questioning defendant was stripped naked and given promise of leniency).

As can be deduced from comparing the content of each parenthetical after these case citations, none of the cases Petitioner references qualify as on-point United States Supreme Court precedent to assess whether the Utah Court of Appeals unreasonably applied law applicable to coercion and involuntariness in this particular confession situation. Petitioner thus has not carried his burden under the federal standard of review. And, the state-court rulings rejecting suppression of Petitioner's incriminating remarks withstand his attack.

### C. Identification Evidence

Was Utah Court of Appeals's affirmance[6] on direct appeal of the trial court's factual findings and legal conclusion that the Federal Constitution was not violated, when allowing introduction of Victim's identification evidence, "based on an unreasonable determination of the facts in light of the evidence presented" or "contrary to, or involv[ing] an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"? 28 U.S.C.S. § 2254(d) (2021).

### 1. Factual Findings

The relevant facts, taken directly from the Utah Court of Appeals' decision on direct appeal, underlying determination that the victim's identification was not unconstitutionally unreliable are recounted:

> Here, the fact that Victim had a gun pointed at his head during the robbery likely affected his capacity to observe his assailant. But . . . Victim was assaulted around 2:30 p.m., was face-to-face with his assailant, and identified Glasscock as the robber less than one hour later in broad daylight. And . . . Victim was able to see all three of

---

[6]The Court looks to the court of appeals's decision on direct appeal, as it is the last reasoned state-court opinion on the claim at issue. *See Ylst*, 501 U.S. at 803.

> the men the police apprehended in the Stratus--including Cropper,
> the man Glasscock claims may have committed the robbery.

*Glasscock*, ¶ 28.

Again, the paramount consideration here is that, by statute, this passage must be presumed as correct and its findings overturned only if unreasonable as viewed against clear and convincing evidence identified by Petitioner. Even so, Petitioner attacks the findings, stating that, "the circumstances surrounding the ID were unconstitutionally suggestive and the victim's description of robber don't match me or my physical description at the time of this alleged event but more matches my co-defendant." (ECF No. 3, at 7.) Petitioner further challenges the Utah Court of Appeals's affirmance of the trial court's factual findings, more specifically alleging: (1) The victim's statement to Investigator Evans "continued to be vague until Evans added his two cents worth"; (2) the victim "never gave a detailed description that differentiated Cropper from [Petitioner]"; (3) the victim did not mention several of Petitioner's distinguishing characteristics--e.g., Southern accent, facial scrape, walking boot, sunglasses, and hand cast; (4) the victim said the robber had blond hair, while Petitioner's is dark brown; (5) the victim viewed Petitioner only in prejudicial situations--i.e., handcuffed and surrounded by officers with guns during a traffic stop, and sitting at the defense table at trial. (*Id*. at 19-20, 22-23; ECF No. 16, at 14.)

Petitioner does not offer any new evidence or new analysis of the evidence. Neither does he challenge the relevancy and efficacy of evidence upon which the state courts relied for their factual findings. He simply repeats the perspective on the evidence that he argued to the Utah Court of Appeals. (ECF No. 7-11, at 17, 32-36.) Having not been put in question by clear and convincing evidence otherwise, these state-court factual findings withstand the habeas standard of review: Victim's capacity to observe the robber was likely affected by the gun pointed at his head; Victim was assaulted in afternoon sunlight; Victim saw his assailant face-to-face; Victim

23

identified Petitioner as the robber less than one hour later in "broad daylight"; and, Victim saw all three men that the police stopped in the Stratus--including Cropper, the one Petitioner suggests may have been the robber. *Glasscock*, ¶ 28.

Indeed, the trial judge-factfinder was in the courtroom when Victim and Petitioner each testified at length about the identification issues and observed in person their actual voices, responses, tones, and demeanors. (ECF No. 7-8, at 9-27, 62-78); *cf. Cockrell*, 537 U.S. at 340 ("Deference is necessary because a reviewing court, which analyzes only the transcripts . . ., is not as well positioned as the trial court is to make credibility determinations.").

Petitioner's conclusory assertions that the courts should give his testimony and arguments greater weight than the judge's own observations of all trial testimony and arguments is not clear and convincing evidence and does not rebut the presumption of correctness under § 2254(e)(1). He thus "fails to persuade the Court that the state court's decision was based on an unreasonable determination of the facts." *Torres*, 2019 U.S. Dist. LEXIS 141986, at *18. In sum, Petitioner has not shown high degree of probability that Utah court factual findings were unreasonable.

## 2. Legal Conclusions

Based on the state-court factual findings upheld above, Utah Court of Appeals affirmed the trial-court decision letting the prosecution introduce evidence of Victim's identification of Petitioner. *Glasscock*, at ¶ 28. Petitioner asserts the affirmance was "inconsistent with *state* and federal law," violating his constitutional rights. (ECF No. 3, at 7 (emphasis added).) He contends the eyewitness identification was unreliable, the product of prejudicial suggestion. (*Id*. at 19.)

Remembering that review is tightly restricted by the federal habeas standard of review, it is important that the Utah Court of Appeals selected the following governing legal principle with which to analyze this alleged due-process issue: a five-factor test, derived from a *state constitutional analysis differing from the federal constitutional analysis*. (ECF No. 3, at 19-23);

24

*State v. Ramirez*, 817 P.2d 774, 781 (Utah 1991) (stating Utah constitutional analysis "diverges somewhat from that in federal case law regarding the admissibility of eyewitness identifications" and "teaches that [Utah courts] do not agree entirely with the *Neil v. Biggers*, 409 U.S. 188 (1972), listing of the relevant criteria for determining the reliability of eyewitness identifications [because they] find some of those criteria to be scientifically unsound"), *holding modified by State v. Thurman*, 846 P.2d 1256 (Utah 1993).

So, the court of appeals analyzed the issue under the Utah Constitution, not the United States Constitution. *Id* at ¶ 26. Petitioner invited that by arguing the issue under the *Ramirez* factors, 817 P.2d at 774, just as he did here. In state court and here, he added a cite to *Biggers*, 409 U.S. at 188, as an afterthought, but with no meaningful differentiation between the *Ramirez* and *Biggers* factors.

Petitioner thus has not met or even tried to meet his burden of finding on-point United States Supreme Court precedent and showing that the Utah Court of Appeals unreasonably applied it. So, the state court rulings allowing victim-identification evidence withstand his attack.

### D. Appellate-Counsel Ineffectiveness

The one remaining issue not procedurally defaulted is now addressed: appellate counsel was ineffective when not (1) moving for a Utah Rule of Appellate Procedure 23B remand to establish ineffective assistance of trial counsel; (2) requesting to file lengthy brief and refiling motions for new trial and to disqualify trial counsel; (3) raising cases *Henderson*, *Lawson*, *Clopten*, and *Brownlee* in the opening brief; (4) raising existence of Officer Fitzgerald on the witness list but not testifying; and, (5) challenging factual findings and legal conclusions on the suppression motion's denial, which shall not be treated further because it was raised on appeal

and is analyzed on the merits in this very Order. (ECF No. 3, at 43-46.) Claims (1) through (4) are reviewed on their merits.[7]

Recalling federal statute tightly curbs review, it is clear that the Utah Court of Appeals selected the right governing legal tenet to analyze the ineffective-assistance issue. *Glasscock*, No. 20170478, at 2 (citing *State v. Frame*, 723 P.2d 401, 405 (Utah 1986) (quoting *Strickland v. Washington*, 466 U.S. 668 (1984))). It is *Strickland*'s familiar two-pronged standard: (1) deficient performance by counsel, measured by a standard of "reasonableness under prevailing professional norms"; and, (2) prejudice to the defense caused by that deficient performance. *Strickland,* 466 U.S. at 687-88. The prejudice element requires showing errors were so grave as to rob Petitioner of a fair proceeding, with reliable, just results. *Id.*

As required by the standard of review, the Court now analyzes whether Utah Court of Appeals reasonably applied *Strickland*. Each of the claimed deficiencies in performance will be examined.

### 1. Counsel did not move for Utah Rule of Appellate Procedure 23B remand to establish ineffective assistance of trial counsel. (ECF No. 3, at 43.)

In assessing the issue of failure to move for a Rule 23B remand under the *Strickland* standard, the court of appeals stated:

> Glasscock asserted that appellate counsel was ineffective for declining to file a rule 23B motion for remand as part of his direct appeal. Rule23B remand "allows supplementation of the record, in limited circumstances, with nonspeculative facts not fully appearing in the record that would support the claimed deficient performance and the resulting prejudice." *State v. Johnston*, 2000 UT App 290, ¶7. Glasscock did not demonstrate that there was any possible evidence, not otherwise in the record, which would support a rule 23B remand. Thus, the district court did not err in

---

[7]The Court looks to the court of appeals's "Order of Summary Affirmance," on appeal from Petitioner's denied state PCP, *Glasscock v. State*, No. 20170478, slip op. (Utah Ct. App. Oct. 12, 2017), as it is the last reasoned state-court opinion on the claim at issue. *See Ylst*, 501 U.S. at 803.

> determining that Glasscock could not establish that appellate
> counsel was ineffective for failing to file a rule 23B motion.

*Glasscock*, No. 20170478-CA, slip op. at 1-2.

Plaintiff does not even argue that the court of appeals was wrong. He simply does not address the court of appeals's conclusion that Petitioner had not brought to the court's attention specific evidence that would show trial counsel's deficient performance or resulting prejudice. He did not then and does not now make any showing of deficient performance by counsel's failure to ask for a Rule 23B remand.

### 2. Counsel did not request overlength brief and did not refile motions for new trial and to disqualify trial counsel. (*Id.* at 44.)

In assessing an alleged failure to request overlength brief and not refile motions for new trial and to disqualify trial counsel under the *Strickland* standard, the court stated:

> The district court determined that Glasscock was not entitled to file an over length brief, and he failed to establish that it was error for appellate counsel to decline to request permission to file an over length brief. The district court determined that appellate counsel made a strategic decision to present Glasscock's claims in a manner that did not require the need for permission to file an over length brief. Glasscock fails to demonstrate that the district court erred by determining his appellate counsel was not ineffective for failing to seek permission to file an over-length brief.

> . . . . Glasscock claimed that appellate counsel was ineffective because counsel did not file a motion for a new trial. Glasscock also claimed that appellate counsel was ineffective for not asserting a claim regarding his post-trial motions on appeal. The district court determined that appellate counsel filed an appellate brief that raised some of the same issues that Glasscock wanted to be raised in a motion for a new trial. Ultimately, the district court determined that even were it to assume that appellate counsel was ineffective regarding the motion for a new trial and Glasscock's post-trial motions, Glasscock had not established prejudice because the appellate court considered his claims on appeal, including his claims ineffective assistance of trial counsel, and affirmed his convictions. Glasscock fails to demonstrate that the district court erred by determining that he was not prejudiced, and that he failed

> to establish that he received ineffective assistance of appellate
> counsel with regard to his "post-trial motions."

*Glasscock*, No. 20170478-CA, slip op. at 2.

Under the standard of review, Plaintiff does not even argue that the court of appeals was wrong. He does not address the court of appeals's conclusions that (a) Petitioner did not specifically challenge the trial court's finding that counsel made a strategic decision about the brief length; and (b) Petitioner ignored the fact that the issues from his post-trial motions were addressed on appeal (or presumably could have been but were not addressed on appeal). Petitioner's arguments here once again fail on the deficient-performance and prejudice prongs, respectively.

### 3. Counsel did not raise cases *Henderson*, *Lawson*, *Clopten*, and *Brownlee* in the opening brief. (*Id*. at 44.) (4) Counsel did not raise the issue of Officer Fitzgerald being on the witness list but not testifying. (*Id*. at 45.)

In lumping together and assessing these issues under *Strickland*, the court stated:

> Lastly, Glasscock asserts that appellate counsel could have raised more of Glasscock's claims on appeal. The district court determined that appellate counsel was aware of Glasscock's additional claims, but either found them to be frivolous, or not as likely to result in reversal as the claims strategically considered and raised in Glasscock's appellate brief. The district court determined that appellate counsel reviewed the requested additional claims and made a reasonable, professional decision to limit the appeal to those claims most likely to result in a reversal of his convictions. The district court also determined that Glasscock failed to show that appellate counsel's failure to raise additional claims was error, or counsel's failure to do fell "outside the wide range of professionally competent assistance." *State v. Frame*, 723 P.2d 401, 405 (Utah 1986). Furthermore, the district court did not err by determining that Glasscock did not affirmatively show that there was a reasonable probability that, but for counsel's failure to include the claims, the outcome would have been different. Glasscock fails to demonstrate that the district court erred by determining that he did not receive ineffective assistance of appellate counsel.

*Glasscock*, No. 20170478-CA, slip op. at 3.

Under the standard of review, Plaintiff does not argue that the court of appeals was wrong. He does not address the court of appeals's conclusions that Petitioner did not specifically challenge the trial court's findings that counsel was aware of Petitioner's other claims but made a strategic decision, based on their weaknesses, to omit them; and that his attorney's decision was reasonable and professional. Petitioner also did not specify how he may have been prejudiced by these omissions. Petitioner's arguments here also fail on the both the deficient-performance and prejudice prongs.

### 4. All claims of ineffective assistance of appellate counsel lack case law on point.

Most importantly, as to ineffective assistance of appellate counsel generally, Petitioner does not suggest any United States Supreme Court on-point case law exists that is at odds with the court of appeals's result.[8] Based on *Strickland*, the Utah Court of Appeals was right to analyze how counsel's performance may or may not have been deficient or prejudicial, and, on the basis that it was not, reject Petitioner's ineffective-assistance-of-appellate-counsel claims. Petitioner has not shown that the court of appeals's application of relevant Supreme-Court precedent was unreasonable. Habeas relief on the basis of ineffective assistance of appellate counsel is denied.

---

[8]These are the only United States Supreme Court cases cited by Petitioner in his petition and opposition memorandum's sections on ineffective assistance of appellate counsel: *Buck v. Davis*, 137 S. Ct. 759 (2017) (concluding ineffective assistance when counsel introduced testimony that petitioner's race predisposed him to violence); *Holmes v. South Carolina*, 547 U.S. 319 (2006) (not ineffective-assistance case); *Schlup*, 513 U.S. at 298 (not ineffective-assistance case); *Crane v. Kentucky*, 476 U.S. 683 (1986) (not ineffective-assistance case); *Evitts v. Lucey*, 469 U.S. 387 (1985) (confirming right to effective counsel on appeal). The Court's review of each of these cases, summed up in parentheticals per case, reveals that none of them are on-point with this case.

## CONCLUSION

Petitioner's claims are either procedurally defaulted or do not succeed under the federal habeas standard of review.

**IT IS THEREFORE ORDERED** that the petition for writ of habeas corpus is **DENIED** and the action **DISMISSED WITH PREJUDICE**.

**IT IS ALSO ORDERED** that a certificate of appealability is **DENIED**.

This action is **CLOSED**.

Dated March 25, 2021.

BY THE COURT:

David Nuffer
United States District Judge